UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | No. 07 CR 50068 |
| | ) | Judge Philip G. Reinhard |
| KATHLEEN THOMPSON | ) | |

**UNITED STATES' SUPPLEMENT TO ITS
OFFICIAL VERSION OF THE OFFENSE**

The UNITED STATES OF AMERICA, by PATRICK J. FITZGERALD,

United States Attorney for the Northern District of Illinois, supplements its

Official Version of the Offense submitted to the United States Probation Office

by letter dated December 21, 2007, as follows:

The embezzlement by Kathleen Thompson ("defendant") related to the sale

of "pull-tabs"[1] and the operation of bingo games by her employer[2] and the victim,

the International Brotherhood of Teamsters Local 325 ("Teamsters Local 325").

Teamsters Local 325 conducted bingo games and sold pull-tabs in its union hall

in Rockford, Illinois on a weekly basis.[3]  Early during the embezzlement, the

---

[1]     A "pull-tab" is a piece of paper, approximately the size of an Illinois State
Lottery ticket, that has a tab or cover over part of it.  When the tab is pulled off, the
paper below indicates whether the purchaser of the pull-tab won and in the amount.

[2]     Defendant was not an officer of Teamsters Local 325.

[3]     Nights when bingo games were conducted and pull-tabs were sold will be
referred to as "bingo nights."  Both bingo games and the sale of pull-tabs are regulated
by the State of Illinois.

local conducted several bingo nights per week. As a result of the defendant's operation of the bingo nights and her embezzlement, the bingo nights stopped being profitable. Thereafter, Teamsters Local 325 began using its own funds to subsidize bingo nights and decreased the number of bingo nights per week. Since the discovery of the embezzlement and the termination of the defendant's employment, the bingo nights have resumed being profitable.

During her embezzlement, the defendant had two primary areas of responsibility: (1) to be the cashier for the pull-tab sales and bingo games; and (2) to be the back room "manager" of the local's bar. The defendant's criminal activities related to the former area of her responsibilities.

Teamsters Local 325 purchased boxes of pull-tabs from an Ohio-based vendor. Each box would contain a set number of pull-tabs. Within that box there would be a certain number of "winning" pull-tabs. The amount won would vary according to a set schedule and the total amount that would be won from all of the pull-tabs in a particular box would be set as well. The Teamsters Local 325 would sell a box of pull-tabs and after paying out the winning pull-tabs would have a certain amount of profit. The receipts from the sale of the pull-tabs along with the amounts paid out to winners would be reported to the State of Illinois and the local would have to pay taxes on the profits.

Local 325 stored boxes of pull-tabs in a storage room that also served as the defendant's office. Access to the room was restricted to four employees, including the defendant. There were usually numerous boxes of pull-tabs in inventory. In addition, the local was required by the state to retain winning pull-tabs for a certain number of months. Those pull-tabs were kept in an empty pull-tab box, along with an adding tape reflecting the payouts, and that box was also kept in the storage room. There were no inventory reports. If anyone went into the storage room, it would appear as though the boxes of pull-tabs were unopened. No one has reason to suspect that many of those boxes were in fact empty and had been arranged to appear as though they were still unopened.[4]

Teamsters Local 325 sold pull-tabs at two different locations in the bingo hall. Some pull-tabs were sold from two pull-tab machines. A purchaser would insert a dollar bill into one of the machines and a pull-tab would be dispensed. If the pull-tab was a "winner," the purchaser would give the winning pull-tab to the cashier who would pay the winning amount to the purchaser. Other pull-tabs were sold from what was referred to as a "rolling tub." Pull-tubs would be placed in the rolling tub and mixed up. A purchaser would buy pull-tabs from

---

[4]     It was the appearance that the local had too much inventory of pull-tab boxes that led to discovery of the embezzlement. Rick Thompson told the defendant to return some of the pull-tab inventory to the supplier.

the cashier.  Winning purchasers would give the winning pull-tab to the cashier and receive the winnings.

Thompson was in charge of the pull-tabs and bingo games.[5]  She was responsible for ordering pull-tabs from the vendor, maintaining control over the inventory, and reporting the receipts and payouts relating to the pull-tabs.  She was the local's only cashier for the pull-tab sales, both from the machines and from the rolling tub, and was the cashier for the bingo games.  No one else was supposed to go in the cashier's area, although occasionally, the defendant's husband would go back into that area.  Monies from the pull-tab machines, from the rolling tub sales, and from bingo were all kept separately.  At the end of each bingo night, Thompson would fill out a pull-tab sales report that reflected the total receipts[6] and payoffs and provide it to her supervisor Rick Thompson (unrelated), then the Secretary/Treasurer of the local, and the receipts were placed in a safe.  The defendant would also prepare a bank deposit slip.  The following business day, either Rick Thompson or Steve Lindquist, then the

---

[5]     Other individuals affiliated with the local would be volunteer workers. Because of state law, only volunteers could work in the bingo games.  However, a paid employee, such as the defendant, could be used to run the pull-tab games.

[6]     The defendant was not required to report the number of boxes of pull-tabs that had been sold.  Thus, there was no reconciliation between the inventory and receipts.

president of the local, would deposit the receipts in the local's bingo bank account, and staple the deposit transaction receipt to the pull-tab sales form.

In order to accommodate those who attended the bingo nights, the local allowed the cashier to cash checks using the bingo funds.[7]  The maximum amount of the check was $25.  If a check was returned for insufficient funds ("bounced"), that person's name would be placed on a list and could no longer cash checks during bingo nights.  The defendant cashed checks written to the Teamsters Local 325 drawn by one individual[8] that were far greater than $25. When one of the local's employees noticed the large amounts of the Player's check, she reported it to Rick Thompson, who apparently approved the defendant cashing those checks.  While the defendant would cash the Player's checks, at the end of the bingo night, she would not turn in the check as part of

_____

[7]      The defendant told investigators of the Department of Labor Office of Inspector General that other Teamsters Local 325 employees cashed checks for patrons and that she only worked in the back room where the pull-tab boxes were stored.  In contrast, local officials said the defendant was the sole cashier and cashed checks.

[8]      This person was referred to in the Plea Agreement as "Player," and will also be referred to herein as "Player."  Some times, the Player's checks would be turned in as receipts.  However, many checks were "cashed" by the defendant, but the check was not included in the receipts.  When later interviewed by Mark Pekay, an attorney for Teamsters Local 325, the defendant said that she cashed the Player's checks and did not turn them in as receipts because the defendant felt sorry for the Player and wanted to help out the Player.  Some of the times that the Player cashed checks on bingo nights, the Player did not use or intend to use the proceeds to play bingo or buy pull-tabs, but simply needed the money to pay for expenses.  On occasion, the Player would meet the defendant at the local union hall when it was not a bingo night and the defendant would cash the Player's check using the union local's funds.

the receipts and instead would keep the check. In order to hide the Player's checks, the defendant would take funds from the pull-tab receipts and would under report the pull-tab receipts. The defendant kept the checks either in her purse or in the safe in the pull-tabs storage room.

On occasion, the Player would bring in cash and "repurchase" her check from the defendant. Both the defendant and the Player agree that the Player would advise the defendant which checks the Player was "repurchasing." However, their statements diverge at that point. According to the defendant, the Player "repurchased" few of her checks, while the Player contends that she paid back the defendant for most of the checks.[9]

When interviewed by the Department of Labor investigators, the defendant said that on the rare occasion when the Player would come to the defendant with cash, the Player would have the cash in an envelope along with a slip of paper denoting the check number or numbers that the cash covered. The defendant said that evening she would give the non-negotiated check or checks to the Player along with the slip of paper, and that she never failed to return a check to the Player when the Player provided the defendant with cash.

---

[9]     While the truth would certainly be relevant in determining an appropriate sentence, it does not affect the offense level as determined under Guideline 2B1.1 or the amount of restitution.

The defendant said that she would then include the Player's cash in the bingo night's proceeds and never kept any of the cash.

In late 2006, Rick Thompson suggested that the local could save money by buying fewer pull-tab boxes and returning excess the pull-tab inventory to the supplier.  When the defendant did not return the inventory, Rick Thompson again asked her about it.  According to the defendant, around this time, she asked the Player for a full repayment of all of the money still unpaid.  The Player brought in $4,100 in cash in an envelope and handed it to the defendant. The defendant said that she had inadvertently left the Player's checks in another purse and promised to give the Player the checks at the next bingo night.  The defendant claimed this was the only time she did not turn over the checks to the Player and that she did not do so on the following bingo night because she was fired.  The defendant said she put the $4,010 in the local's safe.  The defendant later turned over all of the Player's checks, including those relating to the $4,010, to Rick Thompson.  Those checks total $33,770.[10]

The Player, on the other hand, gives a different story.  The defendant cashed the Player's checks as far back as 2002.  The Player would write the check payable to the defendant and receive the money.  The checks would then

---

[10]    An audit of the pull-tab inventory reflected that $36,017 in net proceeds were missing.

clear the Player's bank. She stopped playing bingo for a while because of family and financial problems, but when she resumed in 2003, the defendant told her to make the checks payable to Teamsters Local 325 and to not date the checks. While thinking this was odd, the Player complied. In 2005, the Player had more financial problems and began borrowing from the union local by having the defendant hold on to checks until she could bring in cash. The Player said she would often give the defendant a tip of $10 or $20 for holding onto the checks and sometimes contributed with others to tip the defendant for conducting the bingo games.[11]

The Player said that the defendant would frequently not have the Player's checks and would say that the checks were either in the defendant's home or that the defendant had lost them. In 2007, the defendant advised the Player that Teamsters Local 325 was going to be audited and would be looking for the money relating to the checks. The defendant asked if the Player could get a loan and repay the remaining funds. The defendant said she needed $5,000 and that she would find the Player's checks that had not been returned in the past and give them to the Player.

---

[11]    The defendant claimed she was never paid by the Player to hold the checks. The defendant said the Player only occasionally tipped the defendant and that the tips were small as the Player was not a good tipper. The Player said her largest tip to the defendant was $100, an amount she gave only once.

The Player's husband cashed a certificate of deposit and met with the defendant. The Player gave $4,010 to the defendant and the defendant returned thirteen of the older checks. As to the more recent checks that the Player had not previously repurchased, the defendant said those checks were at her home and she had not yet located them. After that meeting, the defendant and her husband went on a cruise. When the defendant returned to work, the Player paid her an additional $1,500, but did not receive any checks back in return.[12] She acknowledged that she still owed approximately $1,000 to the local.

The Player turned over to the union local and later to the Department of Labor agents a hand-written ledger that she had kept. The ledger reflected the dates, check numbers, and amounts of checks that she had written to the local and which the defendant had held. It also reflects those that she paid the defendant for most of the checks and did not receive many of those checks back from the defendant.

Whether the defendant did in fact profit from her embezzlements is an important sentencing consideration. While it may not affect the Guidelines range or amount of restitution, helping out an old friend who was down on her

---

[12]    As noted below, the Player kept a hand-written ledger of her checks and repayments. The ledger reflects that she paid the defendant $1,500 in cash on March 22, 2007, and $4,010 in cash on April 9, 2007.

luck financially is a far cry from taking more than $30,000 from her employer for her own venal purposes.

WHEREFORE, the government respectfully submits its Supplement to the Official Version of the Offense.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

BY:  /s/ John G. McKenzie
JOHN G. McKENZIE
Assistant United States Attorney
308 West State Street - Room 300
Rockford, Illinois  61101
(815) 987-4444

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that on January 31, 2008, the following document:

### UNITED STATES' SUPPLEMENT TO ITS OFFICIAL VERSION OF THE OFFENSE

was served in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers, if any, and a copy was hand-delivered to the United States Probation Office in Rockford, Illinois.

    /s/ John G. McKenzie
JOHN G. McKENZIE
Assistant United States Attorney
308 West State Street - Room 300
Rockford, Illinois 61101
(815) 987-4444